IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VISION REAL ESTATE<br>INVESTMENT CORP., AUTUMN<br>ASSISTED LIVING PARTNERS,<br>INC., and MICHAEL HAMPTON | )<br>)<br>)<br>) | NO. 3:18-cv-00014 |
| | ) | |
| Plaintiffs, | ) | JUDGE CAMPBELL |
| | ) | |
| v. | ) | MAGISTRATE JUDGE NEWBERN |
| | ) | |
| METROPOLITAN GOVERNMENT<br>OF NASHVILLE & DAVIDSON<br>COUNTY, METROPOLITAN<br>DEVELOPMENT AND HOUSING<br>AGENCY, JIM SHULMAN, and<br>DOMINICK LEONARDO, | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court are Defendant Metropolitan Development and Housing Agency's Motion to Dismiss (Doc. No. 72) and Motion to Dismiss by Defendants Jim Shulman and Dominick Leonardo. (Doc. No. 68). Plaintiffs Vision Real Estate Investment Corporation, Autumn Assisted Living Partners, Inc., and Michael Hampton (collectively "Plaintiffs") filed responses to each motion (Doc. Nos. 78 and 81), and Defendants Metropolitan Development and Housing Agency ("MDHA"), and Shulman and Leonardo filed replies. (Doc. Nos. 86 and 89). For the reasons stated below, MDHA's Motion to Dismiss is **GRANTED**, in part, **DENIED**, in part. The Motion to Dismiss by Defendants Shulman and Leonardo Motion is **GRANTED**.

# I.     FACTUAL ALLEGATIONS[1]

Plaintiffs Vision Real Estate Investment Corporation ("Vision") and Autumn Assisted Living Partners, Inc. ("Autumn"), are Tennessee corporations.  Michael Hampton is the sole owner of those companies. (Compl., Doc. No. 45, ¶¶ 1-2).  Hampton formed the companies in anticipation of purchasing and developing a parcel of land in north Nashville known as the "Bordeaux Hospital Property." (*Id*. at ¶ 12).

Defendant Metropolitan Government of Nashville and Davidson County ("Metro") is a Tennessee municipal corporation. (Id., ¶ 4).  Defendant MDHA is a public body corporate and politic formed under the Housing Authority Law of Tennessee. Tenn. Code Ann §§ 13-20-101 *et seq*.  Defendants Jim Shulman and Leonardo are or were Metro Councilmembers. (*Id*. ¶ 7).

## A.  The Agreements

Although the Bordeaux Hospital Property was largely undeveloped, it was the site of the Metro-owned JB Knowles Assisted Living Facility (the "Facility"). (*Id*. at ¶ 13).  On January 10, 2014, Plaintiffs Vision and Autumn entered into a series of three separate agreements relating to the Bordeaux Hospital Property.

Autumn entered into the Agreement to Lease and Purchase (Doc. No. 45-2) (the "Lease Purchase Agreement") with Metro and the Hospital Authority of the Metropolitan Government of Nashville and Davidson County (the "Hospital Authority") whereby Metro agreed to "lease and eventually sell" the Assisted Living Facility to Autumn. (Doc. No. 45-2 at 1). The Lease Purchase Agreement provided that Autumn would purchase the Assisted Living Facility from Metro not later than July 1, 2016, for a purchase price of $500,000. (*Id*. at 2). Additionally, Autumn agreed

---

[1]     Factual allegations are taken from Plaintiffs' Second Amended Complaint (Doc. No. 45).  All references to the "Complaint" are to the Second Amended Complaint.

to make at least $300,000 in capitol improvements to the Assisted Living Facility during the first eighteen months of the lease. (*Id*. at 1).

On that same day, Autumn entered into a Lease Agreement (Doc. No. 45-1) (the "Lease Agreement") with Metro whereby Autumn agreed to lease and operate the Facility from July 1, 2014 to July 1, 2016, or until such time, no later than July 1, 2016, as Autumn purchased the property in accordance with the Lease Purchase Agreement. (*Id*.). The Lease Agreement contains terms and conditions requiring, among other things, that Autumn maintain commercial general liability insurance ($1 million) and property insurance ($750,000). (*Id*. at 4). The Lease Agreement provides that, in the event of default, Autumn will have 30 days to cure. (*Id*. at 7).

On January 10, 2014, Metro and Vision entered into a contract ("First Contract") for Vision to purchase and develop approximately 74.8 acres of the Bordeaux Hospital Property. (*Id.* at ¶ 14). Metro agreed to sell the property to Vision to help offset the operating losses related to operation of the Facility[2]. The sales agreement in the First Contract was consideration for Autumn entering into the Lease Purchase Agreement. (Doc. No. 45, ¶ 15). Execution of the First Contract was contingent on the Tennessee Legislature passing certain legislation. (*Id*., ¶ 18). When the Tennessee Legislature did not pass the required legislation, Vision and Metro renegotiated and entered into a second Purchase and Sale Agreement on June 26, 2015 (the "Second Contract"). (*Id*., ¶¶ 18, 22; Doc. No. 45-3).

In August 2014, between the execution of the First Contract and the Second Contract, the Metro Council passed an ordinance reallocating $10 million of Federal Community Development Block Grant Disaster Recovery funds (the "federal funds") to "the community of Bordeaux."

---

[2]     The Assisted Living Facility was losing more than $2,000,000 per year prior to Autumn taking over the operation of the facility. (Doc. No. 45, ¶ 15).

(Compl., ¶¶ 27, 31, 81, 82). Plaintiff alleges MDHA advocated for the reallocation of the federal funds. (Id., ¶¶ 27, 31, 81). The "community of Bordeaux" included a portion of the real property that was the subject of the First Contract. (*Id*., ¶ 31). According to the Complaint, the federal funds were required to be used to construct new housing in a flood impacted area, and the Bordeaux Hospital Property was the only property in Nashville that qualified. (*Id*., ¶¶ 31, 81). If the federal money was not spent at the Bordeaux Hospital Property, Nashville's Housing Agency would be required to return the $10 million federal grant. (*Id*., ¶ 82).

The Second Contract was for the sale of two smaller tracts of land at the Bordeaux Hospital Property – Tract 1 (29 acres) for $300,000; and Tract 2 (16.5 acres) for $300,000. (Doc. No. 45-3). Pursuant to the terms of the Second Contract, Vision paid $25,000 in non-refundable earnest money to Metro, and Metro incurred an obligation "to support Vision's application to rezone the subject Property to allow construction of project specified in the Bordeaux Hills Redevelopment District." (*Id*. at 3). The Second Contract provided that as conditions precedent to the sale of Tract 1: (1) Autumn must complete the capital improvements to the Facility as required by the Lease Purchase Agreement; and (2) Autumn must have completed the purchase of the Facility and be operating the Facility as "an assisted living facility fully licensed by the State of Tennessee." (*Id*. at 4). The sale of Tract Two was conditioned upon the completion of the sale of Tract One and the construction of at least 32 affordable, senior housing units on Tract One. (*Id*.).

### B. Rezoning

In April 2014, Vision applied to the Metro Planning Department for rezoning of the First Tract.[3] (Doc. No. 45, ¶ 28). The following year, in April 2015, Vision requested signatory

---

[3] The Court notes that April 2014 is more than one year before Metro and Vision entered into the Second Contract.

approval for a rezoning application from the Metro Department of Law. (*Id.*, ¶ 32). Metro's Director of Law stated that Vision was to work with MDHA, which had been charged with ensuring "the Bordeaux property was developed in accordance with the approved development plan." (*Id.*). Plaintiffs allege they made "numerous requests for signatory approval to submit the needed zoning change" over a 16-month period. (*Id.*) Plaintiffs allege a policy of "Councilmanic courtesy" a result of which is that rezoning of property cannot occur unless the application is supported by the Metro Councilmember in whose district the property sits and that Councilmanic courtesy caused their rezoning application not to be heard. (*Id.*, ¶¶ 29, 30).

The Complaint does not specify the sequence of events, by which the zoning application was signed by Metro, but states that the Metro Councilperson for the First District (the district in which the Bordeaux Hospital Property is located) "supported a zone change request for the Bordeaux property as submitted by MDHA" and submitted a zone change bill (BL2015-1209) on June 2, 2015. (*Id.*, ¶ 33). The zoning bill passed two readings of the Metro Council, but was withdrawn at the request of MDHA at the July 21, 2015 Metro Council public hearing, prior to the third and final reading. (*Id.*).

Before the July 21, 2015 meeting, Vision learned that BL2015-1209 would be withdrawn and formally requested MDHA reinstate the bill with a change in the parcel of land from 192 acres to 11.5 acres. (*Id.* at ¶ 34). MDHA responded to the request to reinstate the zoning application: "[W]e're moving with the redevelopment district at Bordeaux as planned. I can't speak to the zoning issues you site [sic]. At MDHA, we're focused on informing on the wisdom of the development district for now." (*Id.*). The property that was the subject of the Second Contract was never rezoned. (*Id.*, ¶ 30).

### C. The Funding Applications

Concurrent with Vision's efforts to rezone the property, Autumn and Hampton were attempting to secure financing to permit them to purchase the Assisted Living Facility pursuant to the Lease Purchase Agreement. (*Id.*, ¶ 36). As part of their efforts, Autumn (through a to-be-formed affiliate) submitted an application for Tax Increment Financing ("TIF") to MDHA on February 23, 2016. (*Id.*, ¶¶ 38, 69). On February 16, 2016, before the application was complete, MDHA executive Joe Cain told the appraiser who had been hired by Autumn that Autumn would not qualify for TIF. (*Id.*). MDHA advised Autumn that review of the completed application would take four to six weeks, but MDHA rejected the application on February 26, 2016, three days after it was complete.[4] (*Id.*). MDHA told Autumn that the "existing currently operated assisted living facility is not considered a redevelopment eligible for tax increment financing dollars as anticipated in the Bordeaux redevelopment plan." (*Id.*, ¶ 96). Autumn requested a hearing before the MDHA Board, but MDHA did not respond to the request. (*Id.*, ¶ 69).

Plaintiffs allege MDHA treated Autumn's TIF application differently than those of non-minority owned businesses, and allege Autumn is the only African American owned company to apply for TIF in the last five-years. (*Id.*, ¶ 67).

Autumn then sought to finance the purchase of the Facility and the First Tract through tax-exempt bonds. (*Id.*, ¶ 54). After a series of meetings, the Metro Nashville Industrial Development Board ("IDB") approved Plaintiffs' application for the issuance of tax-exempt revenue bonds on or about December 14, 2016. (Id, ¶ 56, 59). The final step for issuance of the tax-exempt bonds

---

[4] Plaintiffs allege conflicting dates regarding the approval of the TIF application. Both allegations state that the application was declined after a three-day review. (Compl., Doc. No. 45, ¶¶ 38, 69). However, in paragraph 38, Plaintiffs state the application was declined in April 2017 – far more than three days after the February 23, 2016, completion date. Paragraph 69 states the TIF application was rejected on February 26, 2016.

was approval of the Nashville mayor. (*Id.*, ¶ 59). The mayor never responded to Autumn's request to approve the bond. (*Id.*, ¶ 61).

Plaintiffs allege Defendant Shulman, then a member of the Metro Council, interfered with the bond approval process in an attempt to "intentionally block approval of the financing." (*Id.*, ¶ 56). Plaintiffs allege Shulman attended IDB meetings, "made representations to the [IDB]," had *ex parte* communications with the IDB chairperson Ginger Houser (who was also a Metro councilperson), and exerted pressure on state surveyors to be "especially critical" in inspections of the Facility. (*Id.*, ¶¶ 56-58, 105).

### D. Contract Modification

In July 2016, Metro informed Hampton and Vision that Autumn was in breach of the Lease Purchase Agreement as it had not made $300,000 in capital improvements to the facility (it had made only $211,782 in capital improvements). (Comp., Doc. No. 45, ¶ 39). Metro said if Vision agreed to sell MDHA six acres of the land covered by the Second Contract, it would forgive the requirements for an audit and $300,000 in capital improvements; and it would extend the closing date to allow MDHA time to complete its environmental review. (*Id.*). MDHA also promised Vision it would "promptly advance a zoning change on the front 11.25 acres" of the Bordeaux Hospital Property, to allow two 100-unit apartment buildings and a strip center as provided in the development plan. (*Id.* at ¶ 40).

On or about August 10, 2016, Vision told MDHA it would sell the six acres for $250,000. (*Id.*). MDHA informed Vision that because it planned to use federal money for the purchase, it could not enter into a formal land purchase contract until completion of an environmental review. (*Id.*). MDHA estimated the environmental review would take 90 to 120 days. (*Id.*). MDHA

drafted a letter of intent, which Vision signed on or about August 11, 2016. (*Id.*). The letter of intent stated the environmental review would be complete by October 31, 2016. (*Id.*).

On October 20, 2016, Vision requested an update on the environmental review, and MDHA said the surveyor for the review should be on site the next week. (*Id.*, ¶ 43). On November 1, 2016, Vision informed MDHA that it was ready to close on the property.[5] (*Id.* at ¶ 44). MDHA responded that it would be approximately three weeks before MDHA would hear back from the surveyor. (*Id.*). On December 22, 2016, MDHA informed Vision that the Metro Council was considering legislation (Bill BL2016-540) that would affect the sale and that MDHA would take no further action until the outcome of the legislation was resolved. (*Id.*, ¶ 45).

### E. The Contract Terminations

On or about December 20, 2016, Defendants Shulman and Leonardo submitted emergency legislation, Bill BL2016-540 (the "Bill"),[6] to rescind the Lease Purchase Agreement on grounds that Autumn was not properly operating the Facility and had allowed insurance to lapse, and to repeal the 2015 ordinance approving the Second Contract.[7] (*Id.*, ¶ 46, 102). The Bill directed the

---

[5]    The Complaint is not clear which property Vision was ready to close on. Given the context, it appears to reference the six acres that are the subject of the letter of intent. However, the Complaint does not discuss the mechanism for closing on a property not yet owned by Vision. In fact, Plaintiffs allege Vision never owned the property that was the subject of the Second Contract.

[6]    The Bill, Metro Ordinance No. 2016-540, states: "An ordinance repealing, in part, Ordinance No. BL2014-688, as amended, to rescind the Metropolitan Council's approval of the Agreement to Lease and Purchase between Metropolitan Government of Nashville and Davidson County, Autumn Assisted Living Partners, Inc., and the Hospital Authority of the Metropolitan Government of Nashville and Davidson County, dated January 10, 2014, regarding the disposition of real property relating to The Knowles Home Assisted Living and Adult Day Services facility; and further repealing Ordinance No. BL2015-1283, as amended, to rescind the Metropolitan Council's approval of the Purchase and Sale Agreement by and between Vision Real Estate Investment Corporation and the Metropolitan Government of Nashville and Davidson County for the sale of approximately 76 acres located at 1010 Camilla Caldwell Lane."

[7]    Plaintiffs state the Facility had been inspected by the Tennessee Department of Health, the Metro Department of Health, Blue Cross Blue Shield, and United Health Care. None of these inspections resulted in adverse action.

Metro Clerk to give notice of the legislation to Autumn, but notice was not given to Autumn or Vision. (*Id.*, ¶ 49). Plaintiffs learned of the pending legislation on January 2, 2017, the day before the public meeting, but did not obtain a copy of the Bill until after the meeting on January 5, 2017. (*Id.*, ¶¶ 49-50, 110).

On January 3, 2017, Councilman Leonardo told Plaintiffs he would defer a vote on BL2016-540 for two weeks to allow Autumn time to close and that the Council meeting would "go smoother" if the Autumn representative was not at the meeting. (*Id.*, ¶ 48, 109). Plaintiffs did not attend the January 3, 2017 Council meeting.[8] (*Id.*, ¶ 48, 50).

On January 6, 2017, Autumn's attorney gave notice to Metro of its desire to close on January 10, 2017 and delivered certified funds to Metro in the required amount of $500,000. (*Id.* at ¶ 51, 111). The closing documents had been prepared and approved by both parties. (*Id.*, ¶¶ 55, 111). A few hours later, Metro sent Vision a letter terminating the Lease Purchase Agreement. The letter explained:

> As you know, § 4.01 of the agreement conditions Metro's obligation to consummate the agreement upon the successful purchase of [the Facility] by Autumn []. While Metro appreciates the hard work that has been put into [the Facility], … Autumn has not complied with its contractual responsibilities, including completing the purchase of [the Facility] by July 1, 2016. Further a number of additional concerns about [the Facility's] current operating conditions have come to light, including maintenance of required insurance coverages and regulatory deficiencies identified by the State of Tennessee. Metro has continued to work with Autumn to ensure quality care to the residents of the facility. However, Metro is no longer under any obligation to sell the facility to Autumn. Accordingly, this condition was not fulfilled within the anticipated time and cannot be met.

---

[8] Plaintiffs allege conflicting reasons for why they did not attend the January 3, 2016, meeting. The Complaint states Vision did not attend the meeting because it did not know about the meeting until January 2, 2019. (Compl., Doc. No. 45, ¶ 50). However, Autumn's representatives were prepared to attend the meeting until Leonardo told them he would defer the Bill two weeks and that things would "go smoother" if the Autumn representative was not at the Council meeting. (*Id.*, ¶ 48).

(Doc. No. 45-4).

The final and third reading of the Bill was on January 17, 2017, two weeks after Leonardo allegedly told Plaintiffs he would delay the bill for two weeks. Plaintiffs attended this Council meeting, but were not permitted to speak because it was not a public meeting. (Compl., Doc. No. 45, ¶ 110). The Bill passed, and on January 20, 2017, the mayor signed the Bill rescinding the Lease Purchase Agreement. (Doc. No. 45 at ¶ 53).

While the Bill was pending before the Metro Council, Metro proposed to Autumn that another management company take over management of the Facility. (*Id*.). Metro's selected management company, Anthem, assumed operations of the Facility on February 1, 2017. Anthem operated under Autumn's lease and state license. (*Id*.).

After Metro terminated its contracts with Plaintiffs, it transferred a portion of the Bordeaux Hospital Property that was the subject of the Second Contract to MDHA. MDHA successfully rezoned the property. (*Id*., ¶ 70, 72). MDHA has a 40 unit, $9.5 million project, to be paid for with the federal funds, planned on 5.5 acres of the Bordeaux Hospital Property that "closely approximate the same property" Vision planned to use. (*Id*.).

### F. Allegations of Discrimination

Plaintiffs allege they were discriminated against on the basis of race during the TIF application process. Plaintiffs state that Autumn was the only minority-owned business to apply for TIF funds in the past five years, and it was rejected. (*Id*., ¶ 67). Plaintiffs allege systematic discrimination by Metro and MDHA with regard to the allocation of tax increment financing and allege discrimination against the historically black communities of North Nashville and Bordeaux has caused development in those areas to be "nonexistent." (*Id*.). In support of this allegation, Plaintiffs allege the following facts:

- There is not one building standing in Nashville owned by an African American that has been approved for TIF. (*Id.*, ¶ 93).

- TIF financing has not been awarded to any minority owned development in the past ten (10) years. (*Id.*, ¶ 97).

- Metro has never approved a TIF project in Bordeaux. (*Id.*, ¶ 93).

- Metro has used TIF to fund projects downtown, in the Gulch, the Bellevue mall, and "a whopping" $16 million in TIF funds for the Westin Hotel. (*Id.*)

**G. The Claims**

Plaintiffs filed this action against Metropolitan Government of Nashville and Davidson County, the Metropolitan Development and Housing Agency, and against former Metro City Councilmembers Jim Shulman and Dominick Leonardo. Plaintiffs allege violations of procedural and substantive due process and of the equal protection clause of the Fourteenth Amendment. In addition, Plaintiffs bring state law claims for breach of contract, inducement to breach of contract, intentional interference with business relationship, civil conspiracy, equitable estoppel, and fraudulent inducement.

## II.  STANDARD OF REVIEW

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true as the Court has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched

as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed under Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). Additionally, courts may consider public records without converting a motion to dismiss under

Rule 12(b)(6) into a motion for summary judgment under Rule 56. *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008).

### III.   ANALYSIS

### A.  Legislative Immunity – Shulman and Leonard

Plaintiffs assert that Shulman attempted to "thwart" tax-exempt bond funding Plaintiffs sought by: attending IDB meetings; making "representations to the [IDB]"; communicating *ex parte* with the IDB chairperson Ginger Houser (who was also a Metro councilperson); and exerting pressure on state surveyors to be "especially critical" in inspections of the Facility. (*Id.*, ¶¶ 56-58, 105). Notwithstanding Shulman's alleged interference, the IDB approved Plaintiffs' application for the issuance of tax-exempt revenue bonds. (*Id.*, ¶ 56, 59).

Plaintiffs also complain that Shulman and Leonardo filed a bill to rescind the Council's approval of the Lease Purchase Agreement and the Second Contract.  (*Id.*, ¶ 43).  Leonardo promised he would defer the bill for two weeks to give Autumn time to close, but did not take any action to defer the bill and it was passed on its third reading two weeks later. (*Id.*, ¶ 48).  Finally, Plaintiffs complain they did not receive notice of the proposed legislation and were denied the opportunity to speak at the final City Council meeting. (*Id.*, ¶ 45, 110).[9]

Defendants Jim Shulman and Dominick Leonard[10] argue they are entitled to absolute legislative immunity from liability for their legislative activities.

---

[9]      Plaintiffs' brief alleges Leonardo, as councilmember for the district holding the Bordeux Hospital Property, failed to return Plaintiffs' phone calls regarding the rezoning. (Pl. Br., Doc. No. 78 at 4). However, a careful reading of the Complaint shows only an allegation that the First District Councilman supported a zone change request.  (Compl., Doc. No. 45, ¶33.)  Regardless, the failure to return phone calls does not state a claim under any of Plaintiffs' legal theories.

[10]      Although the Complaint does not provide their specific dates of service on the Metro Council, the allegations regarding Shulman and Leonard pertain only to the time they served on the Metro Council. Defendants Shulman and Leonard state that they were not on the Council in June and July of 2015 – when

The Supreme Court has recognized that "the principal that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998). "The Federal Constitution, the Constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities." *Id*. at 49 (citing U.S. Const., Art. I, § 6; *Tenney v. Brandhove*, 341 U.S. 367, 372-75 (1951)). Accordingly, the Court has held that State, regional, and local legislators are entitled to absolute legislative immunity from liability under § 1983 for their legislative activities. *Id*.

Absolute legislative immunity attaches to all action taken "in the sphere of legitimate legislative activity" even when the legislative activity is directed at an individual. *Id*. at 55. Immunity applies to all actions that are integral steps in the legislative process. *Id*. at 54. In *Tenny*, the Court held that voting for an ordinance, introduction of legislation, and signing legislation into law were formally legislative. *Id*.

Tennessee law also provides immunity from suit to Council members arising from legislative activities. *See* Tenn. Code Ann. § 29-20-201(b)(2). Following the reasoning of the Supreme Court in *Bogan*, Tennessee courts apply legislative immunity to activities related to legislative function. *See Miller v. Wyatt*, 457 S.W.3d 405, 411-12 (Tenn. Ct. App. 2014). Accordingly, the court does not "probe into [defendant's] intentions or motivation" regarding actions "arising from the conduct of the affairs of the [] City Council." *Miller*, 457 S.W.3d at 412 (citing *Bogan*, 523 U.S. at 55).

Defendants' activities related to the bill to rescind the Lease Purchase Agreement and the Second Contract fall squarely within the umbrella of legislative immunity and are, therefore,

---

Plaintiffs allege the exercise of "Councilmanic courtesy" delayed review of the zoning request. (Shulman Brief, Doc. No. 69 at 3) (citing public records).

immune from suit. However, Shulman does not claim that his unsuccessful actions to "thwart" the tax-exempt bond measure were legislative activity. Therefore, the Court will consider whether plaintiffs state any claims against Shulman with regard to those allegations.

**B. Procedural Due Process**

Plaintiffs bring a claim for violation of their right to procedural due process guaranteed by the Fourteenth Amendment under 42 U.S.C. § 1983. Plaintiffs allege Defendants violated their right to procedural due process on four occasions: (1) termination of the contract; (2) application for a change of zoning; and (3) application for TIF funds. (Doc. No. 45 at ¶¶ 34, 38, 46, 56, 95-96, 125). In addition, Plaintiffs claim deprivation of their "constitutional right to earn a living through the development of the contract property, the operation of the Assisted Living Facility, and other activities that would have resulted in income and profits to the Plaintiffs." (*Id*. at ¶ 129).

The Fourteenth Amendment forbids a state from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. The fundamental requirement of due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). To establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).

1. Termination of the Contracts

Plaintiffs claim the Bill terminating the Lease Agreement and the Second Contract was passed by the Metro Council without notice and an opportunity to be heard. (Compl., Doc. No. 45, ¶ 135) ("Defendants' actions depriv[ed] Plaintiffs' [of their] liberty and property rights … obtained

by Plaintiffs under the various contracts and agreements" without notice.") Specifically, Plaintiffs claim they did not receive notice of the legislation and were not allowed to speak at the one Metro Council meeting they attended. Although Plaintiffs do not make any specific procedural due process allegations regarding Metro's decision to terminate the Lease Purchase Agreement, the Court will consider the general claim that Defendants made decisions "on numerous occasions" without affording Plaintiffs an opportunity to be heard, to include the termination of the Lease Purchase Agreement. (*See Id*., ¶ 124).

MDHA argues Plaintiffs have not alleged facts to show MDHA was responsible for the alleged due process violation with regard to termination of the three contracts. The Court agrees. A broad reading of the Complaint shows that Plaintiffs allegation connecting MDHA to the termination of the contracts are: (1) MDHA lobbied for passage of a Metro Council Bill to allocate the Federal Funds to the Bordeaux Hospital Property, a portion of which was under contract to Vision and Autumn; and (2) lobbied for a bill to terminate the Lease Agreement and the Second Contract. (Compl., Doc. No. 45, ¶¶ 26-27, 45).[11] Neither of these allegations involve denial of due process. If any due process was required with regard to the termination of the contracts, MDHA was not the party to provide such process.

2.  Zoning Change Requests

Plaintiffs allege the use of "councilmanic courtesy" to "defer and/or control" the zoning of the property under contract violated their rights to procedural due process with regard to the consideration of their zoning request. Plaintiffs allege that because of "councilmanic courtesy" MDHA refused to sign the zoning request until the councilperson for the district in which the property was located agreed to the zoning change. (*Id*., ¶ 125). Plaintiffs further allege MDHA

---

[11]    The "Additional Facts Specific to Defendant MDHA" do not add more to the allegations regarding the termination of the contracts. (*See* Compl., Doc. No. 45, ¶¶ 75-100).

withdrew the zoning request without notice or an opportunity to be heard as to the withdrawal. (*Id*.)  Defendants argue Plaintiffs had no property interest in the zoning change.

In order to have a property interest in a benefit, a person must have more than a desire for it or unilateral expectation of it; rather, he must have a "legitimate claim of entitlement to it"—in this case, a legitimate claim or an entitlement to the rezoning. *Braun v. Ann Arbor Charter Tp*., 519 F.3d 564, 573 (6th Cir. 2008) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972)). "[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 856 (citing *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 409 (6th Cir.2002)); *see also*, *White Oak Property Dev., LLC v. Washington Tp. Ohio*, 606 F.3d 842, 854 (6th Cir. 2010) (Plaintiff had no property interest in constructing the dwellings because they were prohibited by the zoning resolution).  To establish a property right in a future, here rezoned, land use, an individual "must point to some policy, law, or mutually explicit understanding that both confers the benefit [] and limits the discretion of the City to rescind the benefit." *R.S.W.W., Inc. v. City of Keego Harbor,* 397 F.3d 427, 435 (6th Cir. 2005) (quoting *Med. Corp.,* 296 F.3d at 409).  In other words, Plaintiffs must demonstrate that the planning commission lacked discretion to deny Plaintiffs' requested use of the land.  *See EJS Prop*., 698 F.3d at 856.

Plaintiffs cannot meet this burden because of the discretionary nature of the zoning process.[12]  The applicable law provides, "The metropolitan council *may* amend the text of this Zoning Code or the official zoning code[.]" Metro. Nashville Code. § 17.40.  The Sixth Circuit has observed that "[t]he use of the word 'may' provides sufficient discretion to undercut any

---

[12]  Plaintiffs' allegations recognize the discretionary authority of the Metro Council to approve or deny a zoning request. (*See* Compl., Doc. No. 45 at ¶¶ 33, 72, 121 (Metro Council determines whether to approve or deny zoning change)).

argument that the language of the zoning regulations vested in [plaintiff] an entitlement to a special use permit." *Triomphe Inv'rs v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995). Because Plaintiffs cannot show a present entitlement to a rezoning of the property when MDHA allegedly "intentionally withdrew the zone change request as part of a plan to block Vision's development from going forward," Plaintiffs do not have a protected interest in the zoning change and, therefore, do not state a due process claim.

### 3. Application for TIF Funds

Plaintiffs allege MDHA denied Autumn's application for TIF financing without adequate consideration and refused to grant a hearing regarding the denial. (Compl., Doc. No. 45, ¶ 130). Plaintiffs' procedural due process claim with regard to the TIF application also fails. First, Plaintiffs did not have a property interest in TIF financing. *See e.g., EJS Properties, LLC*, 698 F.3d at 856 (no property interest in discretionary benefit); *LRL Prop. v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1110 (6th Cir. 1995) (no cognizable property interest in Section 8 funding where plaintiffs could not show they had actually been awarded funding); *La. Cmty. Dev. Capital Inv. Fund, Inc. v. Grambling Legends Square Taxing Dist.*, No. 14-2212, 2015 WL 1737954, at *7 n.11 (W.D. La. Mar. 16, 2015) (explaining that although Plaintiffs did not assert a due process claim with respect to their claim for denial of TIF financing, such a claim would not survive the defendant's motion to dismiss because "discretionary statutes do not give rise to constitutionally-protected property interests").

Moreover, Plaintiffs have no property interest in the procedure itself. *See LRL Properties*, 55 F.3d at 1110. In *LRL Properties*, the plaintiffs alleged a violation of procedural due process when they were denied a "proper appeal" after the denial of Section 8 housing funds. *Id*. The Sixth Circuit reasoned that the plaintiffs' "right to the funds never ripened into a legitimate claim of

entitlement and the right of appeal is in and of itself no more than a procedure." *Id*. The court held

the denial of an appeal, even though it was a violation of the applicable federal regulation, did not

create a property right that could be vindicated in a § 1983 action. *Id*. Here, Plaintiffs do not even

cite a regulation entitling them to an appeal regarding the denial of their application for TIF funds.

Accordingly, Plaintiffs do not state a claim for violation of due process with regard to the

TIF application.

  *4. Right to Earn a Living*

Finally, Plaintiffs assert that Defendants deprived them of a liberty interest, *i.e.*, "the ability

to earn a living through the development of the contract property, the operation of the Assisted

Living Facility, and other activities that would have resulted in income and profits to the

Plaintiffs." (Doc. No. 45 at ¶ 129). Constitutionally protected liberty interests include "the right

of the individual … to engage in any of the common occupations of life." *Taylor Acquisitions,

LLC v. City of Taylor*, 313 F. App'x 826, 833 (6th Cir. 2009) (quoting *Meyer v. Nebraska*, 262

U.S. 390, 399 (1923)). "Based upon the Supreme Court's language in *Meyer*, [the Sixth Circuit]

has held that 'freedom to choose and pursue a career' qualifies as a constitutionally protected

liberty interest." *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983).

Plaintiffs have failed to allege facts sufficient to support a plausible claim that Defendants

have interfered with their rights to pursue its occupation as a developer (or any other occupation).

Interference with a right to develop a specific property is insufficient to establish a violation of

Plaintiffs' liberty interest. *See Taylor Acquisitions, LLC*, 313 F. App'x at 833. In *Taylor*, the court

held that the plaintiff's allegations were insufficient to establish a liberty interested because "[t]he

factual allegations in the complaint only support a conclusion that [d]efendants interfered with

[p]laintiff's right to develop the *specific property* at issue in this case" rather than interference with

plaintiff's right to choose a career as a developer. *Id.* (emphasis in original); *see also Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir. 1989) (noting that plaintiff "was not denied the choice of his career, but remains free to pursue his chosen profession at another university").

### C. Substantive Due Process

"The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process." *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008) (quoting *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003)). "Government actions that burden the exercise of … fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling government interest." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000). "Government actions that do not affect fundamental rights or liberty interests … will be upheld if … they are rationally related to a legitimate state interest." *Id.* at 575.

To state a substantive due process claim, Plaintiffs must establish that "(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Braun*, 519 F.3d at 573. Plaintiffs must first show the existence of a constitutionally protected property or liberty interest. *See Silver v. Franklin Twp., Bd. of Zoning Appeals,* 966 F.2d 1031, 1036 (6th Cir. 1992) ("To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally-protected property or liberty interest."); *Triomphe Investors*, 49 F.3d at 204 (holding failure to identify constitutionally protected property interest defeated substantive due-process claims)

The Complaint makes no effort to tie the alleged facts to the substantive due process claim. (*See* Compl., Doc. No. 45, ¶¶ 137-143) (alleging "Defendants' action in the current matter as set

forth above have been arbitrary and tainted with improper motive which have resulted in a deprivation of Plaintiff's liberty and property rights.")  Plaintiffs' brief on this issue provides no additional insight.  (*See* Pl. Br., Doc. No. 81 at 17-20) (arguing "Plaintiff's substantive due process claims survive for the same reasons as previously presented addressing the procedural due process claims.")

As discussed with regard to the procedural due process claim, Plaintiffs have not alleged facts to show *MDHA* deprived them of a protected property interest in the contracts.  Even if Plaintiffs had a property interest in the contracts themselves, there is no indication that MDHA, which was not a party to any of the contracts, was responsible for their termination.

Moreover, because Plaintiffs do not have a constitutionally protected property or liberty interest in their application for a zoning change, their TIF application, or their ability to earn a living through the development of the property under contract, their substantive due process claim fails as to these theories of liability. *See Wayne Watson Enter., LLC v. City of Cambridge*, 751 F. App'x 760, 763 (6th Cir. 2018) ("Both procedural and substantive due process claims require [plaintiff] to show that he has a property interest that was deprived."); *Taylor Acquisitions*, 424 F. App'x at 834 ("[I]nsofar as Plaintiff has failed to assert a property or liberty interest for purposes of procedural due process, its substantive due process claims also fail.").

### D.  Equal Protection

The Equal Protection Clause of the Constitution provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, S1. The Equal Protection Clause prohibits discrimination by the government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others

similarly situated without any rational basis for the difference. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).

Plaintiffs allege they were subject to unequal treatment in the consideration of their TIF application because MDHA does not approve TIF to African-American owned business or to projects in historically African-American neighborhoods. Plaintiffs list development projects recently undertaken in non-historically black areas of Nashville – Westin Hotel, Bellevue Mall, "projects in the Gulch," Rolling Hills, and a project by a Florida firm. (Pl. Br., Doc. No. 81 at 21; Compl., Doc. No. 45, ¶ 91, 93). As further evidence of racial bias, Plaintiffs allege MDHA has never approved a TIF project in Bordeaux (a historic African-American community) and there is "not one building standing in Nashville owned by an African-American that has been approved for TIF financing". (Compl., Doc. No. 45, ¶¶ 93, 94, 97, 149). Finally, Plaintiffs allege MDHA awarded TIF financing to Old Hickory Towers, "an existing and operating senior high rise," even though it claimed Plaintiffs' project was not eligible. (*Id.* at ¶ 96).

Citing *Farm Labor Organizing Committee v. Ohio State Patrol*, 308 F.3d 523 (6th Cir. 2002), Defendant MDHA argues Plaintiffs equal protection claim must be dismissed because Plaintiff has not established any similarly situated comparators. (MDHA Br., Doc. No. 73 at 25).

Plaintiffs do not claim the law or regulations regarding TIF include race-based classifications. Rather, Plaintiffs argue that the implementation of those regulations through MDHA's decision making process was based on the race of the applicant or the racial makeup of the area to be developed. Plaintiff must show that the award of TIF funds had a "discriminatory effect and was motivated by a discriminatory purpose." *See Farm Labor Org.*, 308 F.3d at 534. Plaintiff can demonstrate discriminatory effect by naming a similarly situated individual who did receive TIF funding or through the use of statistical or other evidence which "address[es] the

crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Id.* (citations omitted). When evaluating whether parties are similarly situated, "courts should not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

Discriminatory purpose can be shown by demonstrating that the decisionmaker took a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group. *Id.* (citing *Wayte v. United States,* 470 U.S. 598, 610 (1985)); s*ee also, Hernandez v. New York*, 500 U.S. 352, 359-60 (1991) ("A court addressing this issue must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact … Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.'" (citation omitted)). In considering whether Plaintiffs have sufficiently pleaded facts supporting a plausible inference of intent to discrimination, the Court considers the following "non-exhaustive" list of factors: (1) "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged decision … may shed light on the decision maker's purpose, (3) departures from the normal procedural sequence … particularly if the factors usually considered important by the decisionmaker strongly favored a decision contrary to the one reached; and (4) the legislative or administrative history." *In re Flint Water Cases*, 384 F. Supp. 3d 802, 846-47 (6th Cir. 2019) (internal citations omitted) (*citing Village of Arlington Heights v. Metro. Housing Dev. Corp*., 429 U.S. 252, 267 (1977)).

Plaintiffs allege that there are no TIF financed projected in the historically black community of North Nashville/Bordeaux and MDHA has never awarded TIF financing to an

African-American owned business. (*See* Pl. Br., Doc. No. 81 at 20-22). MDHA argues that Plaintiffs have not sufficiently pleaded similarly situated comparators, focusing their argument on whether a specific business is similarly situated to Autumn. (*See* MDHA Br., Doc. No. 73 at 26).

Plaintiffs allege MDHA has not funded projects specifically in North Nashville/Bordeaux as evidence of discrimination against predominately black areas. Plaintiffs to not plead facts showing the racial makeup of those areas that *have* received funding as compared to those areas that have been denied funding. Without more, the allegation that MDHA has not approved TIF for projects specifically in North Nashville/Bordeaux is insufficient to show discrimination against predominately black neighborhoods in general. Moreover, Plaintiffs present no additional information about the projects in Bellevue, the Gulch, and other areas to show the projects are similar in relevant aspects to the project Plaintiffs proposed at the Bordeaux Hospital Property.

In support of the contention that MDHA discriminates against African-American business owners, Plaintiffs claim that there "is not one building standing in Nashville owned by an African American that has been approved for TIF financing." (Compl, Doc. No. 45, ¶ 93). However, Plaintiffs also state that they are the only African-American owned business to apply for TIF in the past five years. (*Id.*, ¶ 67). Denial of one application, without more, is insufficient to raise an inference of racial discrimination.

With regard to Plaintiffs' specific project, they have not sufficiently shown any similarly situated projects that were approved. Plaintiffs claim Old Hickory High Rise is a similarly situated project, but the only information alleged to compare Old Hickory with the Facility is that they both apparently house seniors. This is not enough to show they are similarly situated in all material respects. *See Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (dismissing equal protection claim when plaintiff alleged only that other condominium units received approval,

but presenting no evidence that these other developments were similarly situated); *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 684 (6th Cir. 2011) (finding plaintiffs' conclusory allegation that another farm owner was similarly situated was "little more than legal conclusions couched as factual allegations")(internal quotations omitted); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (dismissing equal protection claim when plaintiffs failed to make any comparison to similarly situated groups).

In addition, Plaintiffs do not allege that MDHA possessed a discriminatory intent or purpose in deciding whether to fund a project through TIF. *See In re Flint Water Cases*, No. 384 F. Supp. 3d 802, at *25 (E.D. Mich. Aug. 2, 2019) (granting the defendants' motion to dismiss an equal protection claim where the plaintiffs' allegations "describe a situation where defendants acted in spite of the harm caused to African Americans. They do not adequately plead that defendants conduct was motivated by that desire."). Plaintiffs claim that MDHA made a decision on its application much more quickly than is typical, but this fact, without more, is not enough to create an inference of discriminatory intent.

Because Plaintiffs have not pled facts to show they were denied equal protection as compared with those similarly situated or alleged discriminatory intent, they have not stated an equal protection claim against MDHA.

### E.  State Claims against Shulman[13]

Plaintiff bring three state claims: inducement to breach of contract, intentional interference with business relationship, and civil conspiracy.  As stated above, the only non-legislative action at issue is Shulman's alleged attempt to "thwart" Plaintiffs efforts to obtain bond financing.  *See supra*, section III, A.  The Court considers whether these allegations state a claim against Shulman as to Plaintiffs' state law causes of action.

####   1.  Inducement to Breach of Contract and Tortious Interference of a Business Relationship

Inducement of a breach of contract requires: "there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff." *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994).

Tortious interference of a business relationship requires:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, . . . and finally, (5) damages resulting from the tortious interference.

*Trau-Med of America, Inc. v. Allstate Ins. Co*., 71 S.W.3d 691, 701 (Tenn. 2002).

---

[13]     As discussed above, all of the allegations regarding Leonardo are actions for which he is entitled to absolute legislative immunity.  *See supra*, section III, A.  Accordingly, Plaintiffs have failed to state claims against Leonardo as to any state law cause of action.

Plaintiffs' claims for equitable estoppel (Claim VIII) and fraudulent inducement (Claim VIV), which are both related to the agreement to sell six acres of land to MDHA, do not allege facts to state a claim against Shulman as to either of these causes of action.

Plaintiffs fail to state a claim for inducement to breach of contract or tortious interference with business relations because, as alleged by Plaintiffs, Shulman's efforts to block bond financing were unsuccessful and, therefore, caused neither a breach of contract nor any damage to Plaintiffs.

2. Civil Conspiracy

Plaintiffs allege "Shulman and Leonardo, together with agents of MDHA, conspired with each other's knowledge to cause a breach of the Plaintiff's relationship and contracts with Metro. They did so by failing to give notice and violating the Plaintiff's due process rights to notice and an opportunity to be heard. Likewise, they induced Metro to violate the notice terms of the contract by and between Autumn and Metro when a purported breach had occurred." (Compl., Doc. No. 45, ¶ 184).

A civil conspiracy is defined as:

> a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff.

*Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (quoting *Trau-Med*, 71 S.W.3d at 703). To be liable under a theory of civil conspiracy, one or more Defendants must be liable for an underlying tort that was committed pursuant to the conspiracy. *Lane*, 334 S.W.3d at 763 (citing *Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)). There must be a concerted effort by the defendants to cause harm to the plaintiff, and the plaintiff must, in fact, suffer harm as a result of the defendants' efforts. *Knott's Wholesale Foods, Inc. v. Azbell*, No. 93-19, 1996 WL 697943, at *5 (citing *Kirksey v. Overton Pub., Inc.*, 739 S.W.2d 230, 236 (Tenn. Ct. App. 1996)).

Shulman's efforts to block bond financing are not alleged to have been in concert with any other defendant. Moreover, as stated above, because his efforts were unsuccessful, the damages

element of the civil conspiracy claim is unmet. Accordingly, Plaintiffs have failed to plead facts sufficient to establish a cause of action for civil conspiracy against Shulman.

### F.  State Claims against MDHA

MDHA argues that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims if the Court dismisses all federal claims. (Doc. No. 73 at 28).  At this juncture, all of the claims against Metro remain pending.[14]  Therefore, the Court will continue to exercise supplemental jurisdiction over the state law claims.  As MDHA has offered no other basis to dismiss these claims, MDHA's motion to dismiss the state law claims is DENIED.

## IV.  CONCLUSION

For the foregoing reasons, MDHA's Motion to Dismiss (Doc. No. 72) is **GRANTED**, in part, and **DENIED**, in part.  Plaintiffs' claims against MDHA for violation of procedural due process (Count I), violation of substantive due process (Count II), and equal protection (Count III) are dismissed.  All other claims alleged against MDHA survive the motion to dismiss.  The Motion to Dismiss by Defendants Jim Shulman and Dominick Leonardo (Doc. No. 68) is **GRANTED**.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

---

[14]    Metro filed a motion to dismiss the original Complaint (Doc. No. 19) and a motion to dismiss the First Amended Complaint (Doc. No 34). The Court denied both of those motions as moot. (Doc. Nos. 28 & 65). Rather than filing a motion to dismiss the Second Amended Complaint, Metro filed an Answer to the Second Amended Complaint on October 10, 2018 (Doc. No. 66).